3090456488 Cavalier v. Andrew Lee v. Century Indemnity Company and all appellants by Stephen Asher Good afternoon members of the panel and council. I'm Steve Asher. With me today is Hugh Griffin for the Appellants, Century Indemnity Company. You may notice that the name of Century has had some different variations over time. In the 60s it was INA, Insurance Company of North America. In the 80s and 90s it was Cigna. These are all for our purposes the same company. Century appeals today from a summary judgment on count one of Caterpillar's complaint which is a common law claim for breach of contract and damages together with interest totaling more than $22 million. In a prior appeal by Caterpillar on a certified question this court specifically recognized that the breach of contract issue was not before it at that time. Today we address that issue. In the prior ruling this court held that Caterpillar should not defend an asbestos filing injury complaint. We believe that for the pre-2005 cases that are part of this appeal there is an issue of fact as to whether Caterpillar ever allowed Century to defend the cases. Following this court's ruling on the certified question, Caterpillar asked the trial court to address the past costs through 2004. These were all cases that Caterpillar selected its own counsel, handled itself and assigned all the costs to either deductible policies or to later years where it had retentions with a captive insurance company and also had excess coverage above the captive coverage and the very beginning of the asbestos suits. Now the damages awarded, the trial court applied $20 million to the 1960s policies. These are policies where Century has the right to defend. We have the right to control and to settle cases. And these are the policies that Caterpillar told us to hold off on. In fact, Caterpillar admits in its brief at page 33 that it concluded not to give us notice in many cases of the asbestos cases because in their argument they say it was futile because we refused to defend, flatly refused to defend the first asbestos cases. But as we will show you in the record, that is not what happened. We acknowledged the defense under the 1960s policies and our client was told to hold off. As we know, there are fact issues on whether Caterpillar wanted us to defend. What they told us is that they want to control the cases. They want to control the settlements. And they did so. Our appeal also addresses the summary judgment on damages. Caterpillar and the trial court applied fees that were, or costs that were incurred not for defending the suits. These were costs incurred by lawyers who were not the defense counsel. They didn't appear in cases and they did not bill their time to any case. Yet the court allowed Caterpillar to go back in time, recreate what was done, and have these costs applied to each individual case as if they were billed to the case. And this is not an insignificant portion of the damage award. It's some $8 to $10 million total. As I mentioned, the 1960 primary policies do not allow Caterpillar to control its own defense and then have Century reimburse the costs. Caterpillar has no right to control settlements under those policies. Contracts say that we will defend in the name of the insured and that Century shall have the right to make such investigations, negotiation, and settlement of any claim or suit as may be deemed expedient by Century. Those policies require Caterpillar to cooperate with our taking control and exercising discretion and judgment in defense of the cases. In the 1970s, on the other hand, there were deductible policies with Century. Those policies allow Caterpillar to select counsel, but the fees are paid by Caterpillar itself on its deductibles. And we still have rights in those cases to be involved in negotiating settlements. Later, the evidence shows Caterpillar, and they told us, that they were assigning the cases to later policy years, going from the 83 to 2002 time period. They told us they were applying the cases to their, and they were specifically charging fees to those policies. And they gave us runs showing that they were eroding their deductibles and they were eroding their retentions based on the same asbestos costs that this judgment includes. That's what happened for many years and as we recognize, as Caterpillar recognizes, they even did not bother to give notice of cases. We put in the record the notices we have, and there's no instance where they gave us notice where they were saying, please, we change your mind, take over the defense. But they say, well, this is because in 1988, when the first asbestos case came in, we refused to defend. That's what they say. In fact, though, when the first asbestos case came in, it was a Callaway case. It was filed in 1986. Caterpillar waited two years to tell us about it. In 1988, they sent the complaint to us, our first notice. This is uncontested. On November 15, 1988, my client, Joseph Mundy, who was a claims person, wrote a letter acknowledging the duty to defend under the 1960s policies. And so this is an inquiry he's making. He's telling them, okay, it's been two years. By the way, it looks like you already settled the case, but we're acknowledging that asbestos cases where the bodily injury is alleged in our year will defend you. Because the case is already settled, he wanted to discuss what they want to do with that case. They wrote back to him on March 13, 1989. This letter is in follow-up to our recent phone conversation. We have decided that the date of March 31, 1981, will be used for this claim. 1981 was a deductible policy. On July 14, 1989, in a letter to Mr. Mundy, he was informed that Caterpillar had tax reasons for assigning the asbestos cases to the later policies, the deductible policies. And on July 27, 1989, Mr. Mundy writes to confirm his understanding that Caterpillar chose to pay asbestos claims on its deductible and had tax benefits from paying the cost itself. October 2, 1989, Mr. Mundy records in writing his understanding that Caterpillar is now handling many claims under their deductible. Mr. Mundy testified in this case. He testified, and this is uncontradicted by any witness from Caterpillar, that he was told to hold off on doing anything. Hold off on doing anything on the defense of asbestos cases. What he testified is that Caterpillar chose to handle these matters themselves. That's his testimony. Hold off on doing anything. In Cincinnati, an insurance company, the Supreme Court said, an insurance company that receives notice where there's actual notice, you know there's a suit, you know you have primary coverage. You have to make an inquiry. We did that, and we were told to hold off. Cincinnati, the Supreme Court said, if the insurance, if the policyholder indicates that they don't want your defense, they have foregone the defense, and you have no obligations. Consistent with Mr. Mundy's testimony, throughout the years, Caterpillar told us that they selected other policy years. We put into record numerous instances where they sent to us forms. They also sent different documents showing that here's the status of our retentions, and they show that they're putting asbestos on their self-insured retentions. They put it on the deductibles. An example's in the appendix at A164 to 65, and there you'll see that they have the years 1983 to 1988 with asbestos claims being put onto their retentions. For many, as we've indicated, for many of the claims, there's no evidence at all that they delivered notice. In Elko, the Supreme Court reversed the summary judgment on one of the claims where there was an absence of notice. That is no evidence at all of any delivery or request, whether actual notice or actual written notice. And here, for most of the cases, we don't have actual notice at any time when we could have defended the suit, and that's what Cincinnati tells us to look for. Do you have notice in time to defend the suit? And if you do, do they want it? And here, a fact finder could easily, readily find that they did not want our defense. And why would they not want our defense? Well, they told us they have tax reasons, but also note that with asbestos cases, there's a lot of strategy. In 2001, we had a series of meetings with them. They asked us to share, pay a share of the cost, and we were willing to do so. What we were told, though, is they absolutely wanted to control. They told us their lawyers are great. They said they have a new regional group of lawyers, 10 law firms around the country, that they want to have those people defend. And we're willing to do that and pay a share of that. And we did. We have paid a share. But when the parties could not agree on exactly what the share would be, we still paid them, okay? We gave them a share that we thought was fair. They filed a suit and said you breached the contract because you failed to defend. Here on this record, you'll see that we did not ignore them. They say we totally ignored them, never responded. That's not true. Mr. Mundy recognized the defense, offered it, and wrote to them, was told to hold off. In the 1990s, we had meetings with them. In fact, there's another case in Chicago with Mark Muth was our witness. He testified about it. They talked about the asbestos defense. And again, they never asked him to take over. And then when Blaine Stanley became the century claim person in the late 80s or 90s, she called Alexander Giftos of Caterpillar and said, I've gotten some of these notices on excess policies. We have a primary. Mr. Giftos testified he admits. She reminded him that we had these 1960s primaries. But those policies don't let Caterpillar control. The control involves judgment of how to handle a stream of cases. Do you want to settle early? Do you want to spend a lot defending? They always wanted to have control of that decision. That's not what the 60s policies allow. They give us that control. I've indicated we have been and we remain willing to work with them on a sharing of the claims. And we've offered, you know, as they point out in their brief in 2008, when they accused us of breaching, we said, we'll take over. We sent the letter saying, please send us any complaints you want us to defend. But they didn't do it. They didn't give us any cases to defend. As to the damage issues, Caterpillar chose to select Crowell & Waring as a national coordinating council. They don't defend the cases, but they've spent a lot of money. There's issues of fact here. Judge Brandt agreed there are issues of fact on whether the Crowell & Waring fees are for the defense of suits. The contracts, even if we had breached, say that our duty is to defend a suit that's potentially covered. These lawyers weren't defending suits. They never appeared in the cases. They never even billed their time to the cases. And it's a significant amount of money. As I mentioned, Judge Brandt found a fact issue as to whether those claims are covered by the policies. The Supreme Court in Pepper said that if an insurance company breaches its duty to defend a case, the policyholder gets the reasonable defense costs for the defense of that suit. That's not what these Crowell & Waring fees are for. Ms. Stanley testified and gave an affidavit as to her discussions, her efforts to share. She had concerns about the amount that they were spending. At one point, she asked for the invoices. Let me see the invoice. You want us to share it? They didn't give it to us. They wouldn't give it to us until we got into this suit and we were able to get it through discovery. So until this lawsuit was brought, the fees at issue here, they never even gave us the invoices, even though we had several requests. Didn't they cost any expenses that were objected to? Yes. They gave us general figures, like we spent $10 million this year, and here's what it's for. $5 million in Crowell & Waring invoices. But didn't the judge, anything that you objected to then, he excluded it from the final amount? No, Your Honor. He only excluded, we had an auditor just do a simple bill, you know, go line by line through the bills, not to determine whether they're covered or not. So this is a separate issue from what, as Judge Brandt, you should notice there are two issues here on fees. One is reasonableness, and that's where we had an auditor go through. The second issue is, are services by this administrative firm, are they covered, whether or not they're for the defense of suits? That issue, Judge Brandt found to be a fact issue that has never been... Well, there was $3 million deducted, wasn't there? There was. And that was... For the audit. That was the auditor, John Tronco. But he did not address issues about whether Crowell & Waring fees are for the defense of suits. He didn't have those files to go back and see what their work was. But there wasn't an issue, I mean, about whether the NCC costs were reasonable or not, was there? There is. I'm sorry, Your Honor. Yes, on the rates that we've said that the rates were excessive at $465 compared to other firms that were in the $250 range. Would you dispute the cost with the trial court? Yes. Yes, Your Honor. And Judge Brandt agreed that there were fact issues. The caterer argued that the only issues were what Mr. Tronco took out, which were the audited fees. But that was not what Judge Brandt found. Brandt found issues about whether the costs were covered for Crowell, whether they were even covered. And then, secondly, if they were covered, are they reasonable? Your time is up, Your Honor. Thank you. Counsel, you may proceed. May it please the Court, can I ask a point about the last thing we're discussing? Did the trial court subtract the cost that the INA objected to? Yes, Your Honor. Yes. The process that was involved is exactly as your question indicates. We started out with $30 million in incurred costs, and then our expert knocked off $2 million. Cases where the wrong insurer was involved or some other mistake, knocked $2 million out. Next thing he did was knock out $3 million, Mr. Tronco's, their experts, everything he contested, to the dollar, everything out. So down to $25 million. Then we gave them credit for the $7.3 million they paid, brought us down to the $17.7 million number. And that's what the judge did. Judge Vespa basically said, your experts have looked at this, and the uncontested amount is $17.7. He then added a pre-judgment interest, and that's the money judgment. Just so the record is clear, Andrew Reedy on behalf of the appellate category. Now, Mr. Asher. I didn't intend not to have you introduce me. No worries, Your Honor. I want to be clear, too, about Mr. Asher's reference to Judge Brandt. Keep in mind the sequence here. Judge Brandt's ruling was a breach of the defense in 2006. Then up to this court was the issue of allocation in 2007. Then it went back to the trial court and Judge Vespa, and there was a time for discovery. And that's when Mr. Tronco, their expert, and Mr. Jones, our expert, did their work. There were depositions, et cetera. Then Judge Vespa entered his ruling, had a hearing, briefing, entered a ruling leading to this money judgment. So Judge Brandt that counsel refers to is early in the process and not at the end of the process. With respect to rate issues, that's an important point as well. Rate issues were not raised. They're raised in the briefing now, but they were not raised by Mr. Tronco. They were not raised at that time before Judge Vespa, and therefore they should not be considered by this court. Now, there's an issue about what Mr. Tronco was doing. Mr. Astor said he had a limited scope. So I went back and I looked at the record as to what his charge was. What did they say he would do? And if you look at the record at C5036, their disclosure of Mr. Tronco indicates the following. One sentence. Mr. Tronco will opine on the bill's invoices of Caterpillar's underlying defense counsel, including but not limited to his analysis of the reasonableness and necessity of the work performed. So it certainly was our expectation that he would look at and do whatever he wanted to do, and we didn't know going into that process whether he would complain about $2 million, $3 million, or $8 million. And we deducted everything he complained about. The issue of national counsel is also important when you think about, in the briefing, talk about three sets of counsel. I want to unwind that a bit and talk about what really goes on in these cases. National Coordinated Counsel, the Crawling Mowing firm from Washington, was hired, and they did the global stuff. They did look at witnesses. They looked at all the corporate witnesses, talked to them, interviewed them, looked at former employees. They pulled the documents out of all the corporate production. They looked for experts. They did research on product use. They did global issues that could be useful in any single case. They did not get into the procedure of particular cases. They did not get into the facts of any particular claim. They were setting up a universal font for Caterpillar to use in defense of these cases. In fact, you have to do that in these cases because you have to make sure your position in Illinois is the same as it is in Texas, as in Caterpillar, or you'll get killed as you go through these cases. So you make sure your defense is consistent, and that's what we did. The regional counsel were the counsel in the various parts of the country who were the trial lawyers working to try these cases. They got involved with the facts of each case. And the local counsel had a very diminished role. In fact, they only came up when regional counsel didn't have an office or national counsel didn't have an office, so in limited places. And their role was quite limited. So what we have is two sets of counsel really actually working the sets of cases, and the third only in rare circumstances. The policies at issue, I think we have to keep in mind what they provide. These policies provide the broadest coverage, according to Judge Brandt, with respect to the duty to defend. And there are no asbestos exclusions, which is especially important because what we're talking about is asbestos bodily injury claims. In the papers is a complaint about or an issue about the tendering of complaints. There are 2,185 complaints. What this complaint is about is an issue about process, because Judge Brandt correctly said and held that these asbestos complaints potentially fall from the coverage of the policies. To provide each of those complaints to the trial court, it's 75 to 80 boxes worth of material. And then have the trial judge review each one is not useful or productive. It's really a waste of judicial resources. And instead, the trial court can rely and did rely upon summaries. The summary here was the Navigating Report by Mr. Jones. All the information Mr. Jones relied upon is listed in Exhibit 1 to his report. It's the complaints. It's the defense bills. It's testimony from the case. All that information was readily available to Century. They had access to it at the time we were providing it to them in the course of defense cases and discovery in this case. We had it twice. Summaries on Illinois are sufficient. They could have objected at any time to any individual summary of an individual case? Absolutely. Yes, Your Honor. Absolutely. They could have raised an issue at any point in time and did not object to this process until we get to fairly late in the game. There was a motion to reconsider. Yes. They filed a motion of reconsideration on issues including this. There's an issue of 154 complainants, 154 plaintiffs out of the 5,000 plaintiffs, which is 3% of the cases there's no complaint for. And so what our position was is these complaints are boilerplate. Century had all of the information related to the case, all the defense files, all the defense bills, and what Navigman did, our expert, is they applied the same statistical analysis they did to the other 97% to come up with a number to attribute. Significantly, Mr. Tronco, their expert, didn't quarrel with this process. Mr. Asher talks about several times that we asked him to hold off. Where is that in the record? The record tells a very different story. The story that tells is that we gave notice of these cases on an individual basis up until 2001. At that point, by agreement, we switched to a quarterly notification process. But let's step back in time to the first case, 1988, the Calloway case. How did they respond? Did they respond and say, we're going to spend the whole case, tender it over to us? Their response was, we'll pay a share. We'll pay a piece of this. That is a breach of the duty to defend. Their option was to either defend the whole thing or, under reservation rights, file a DJ. Their option wasn't to offer a percentage of the defense cost. Now, this is a corporate policy that just simply wasn't for one point in time. It's from 1988 all the way through 2004, and those are the complaints that are issued here. Mr. Asher talks about 2008. All they did in 2008 was, after this court ruled on allocation, they acknowledged a defense obligation. But if you look back to the very first time, I'm talking about 1988, and I refer to the record to S17, Exhibit 1, with a document marked CN3344, and they say, quote, as advised, this organization, referred to Century, adheres to equal shares contribution concerning defense. Mr. Mundy, the person they talked about, Mr. Mundy testified their corporate position at page 53 of his deposition was to pay a pro rata share. That was not right then. It's not right now. Their obligation is to defend the entire case. So they were in breach. Once they were in breach, they can't unwind the clock. They can't complain about a lot of things. They were in breach, and Caterpillar was excused from providing individual notice. The case besides that is Davis v. United Fire. It's an opinion of this court, and in that court, in that case, there was a notice of an accident, and the insurer denied coverage. Then a little bit later, there was an actual lawsuit brought, and the complaint wasn't tendered. The court said there was no need to tender it. It was futile because there was a denial of coverage on the accident. Here there's a corporate policy unwavering to pay a pro rata part of the defense, not an entire defense, and that is a breach of the policy. Their papers rely upon another decision of this court, West America v. Yorkville. What's distinguishing about that case is there was no breach of duty to defend in that case, and the insurer filed a declaratory judgment action when they had questions about their obligations under the policy. Would there be legally a statement by the insurer that you don't want the assistance of the insurance company if you want to control everything? I mean, they're arguing that Caterpillar wanted to control everything. How does that relate to whether or not you're seeking their assistance? Well, it's a chicken and egg sort of thing. I mean, they never tended to, they never offered to provide a full defense to us. So what we did was we instead put a defense process and procedure in place. And so if they had ever come to us and said we want to defend these cases in total, it would have been a different story. But we didn't have that situation. So after we were denied, we set up a defense. And so we never quite got to the situation where we ever were presented with the opportunity to forego a full defense. It never happened. You know, some of the cases indicate that if you, as the insurance company, go to your insurer and say do you want our assistance, and if the insurer is uncooperative or unresponsive or saying that we don't, then that would discharge a duty. They're trying to fit their argument into that analysis, correct? Correct. Okay. And what is the documentation that you have related to that argument? I mean, you indicated certain things to them that you kept on giving them notice, and then you agreed to a quarterly notice. Let me, the trial court found persuasive a couple of different things. One was in 1991, there were several letters that are in the record and cited by the trial court where we said please do all that is necessary to protect the interest of the insurer. In accordance with the terms of the power. Correct. In accordance with the terms and conditions of all applicable policies. You had that mantra going through all that whole time period. That's correct. That's correct. And then in 2001, we again, through our outside counsel, asked them to defend Caterpillar against these claims and reimburse and pay the amounts paid to date. Counsel, you have two minutes. So we have a very clear record of asking them to do it. The question is, where is that record that they look at to say we chose to waive and walk away from our defense? It doesn't exist. We would never offer, there's not a single document in this record where they say we're going to fully defend you. So I think the answer to the question is, as an academic matter, an insurer can refuse a defense, no question about it. In this case, it didn't happen because we were never offered a defense, and therefore never refused to defend. In terms of one issue that I want to make sure I address also is the pre-judgment interest point. It's the sound discretion of the trial judge as to how to computate and when to start the clock on pre-judgment interest. In this case, that clock started when Caterpillar was out of pocket for the defense costs. And that seems to be the appropriate point here because the whole purpose of pre-judgment interest is to make the insurer whole. We would ask that the court affirm the trial court in both instances and also not reconsider its ruling from 2007 regarding allocation. Your Honor, the Callaway case was, they're saying is evidence of our breach. The Callaway case was filed in 1986. What did Caterpillar do when they got it? They hired a lawyer. When did they tell us? Two years later. At that time, they settled the case. They had settled the case before they even told us about it. That's not letting us control the defense. Our policies give us the right to defend in their name. To hire counsel, that's what we do. We hire counsel for Caterpillar. We're not allowed to use them. Okay? That's the fact. Those are in the record. We want to defend them. And we've been trying for years. We started with Callaway. We offered in our letter. We recognized that we have a duty to defend. Now, the Callaway case had been settled. So, yeah, we were offering a compromise. 50-50. We'll do it 50-50. Often when we have two insurance companies, like they had deductibles, we'll say, You want to do equal shares? They want control, remember. They don't deny it. They absolutely want it controlled. That's what they told us. They said they want to handle it under the deductibles. The testimony of Mr. Mundy is absolutely unrefuted. We're not saying we're entitled to summary judgment. The fact is, though, that there are serious issues of fact for a lot of money at stake as to whether they ever want us to defend. The fact is they don't. They don't want us to defend. They won't let us. And we've been trying. Okay? And we asked them. We asked them. And Mr. Mundy was specifically told in writing, No, we are applying this Callaway case to the deductibles. Thereafter, he was told again and again, when they would send notices, they would tell us, We're assigning it to year 1995, 1998. We had a number of discussions over the year with them. There are at least factual issues on this record as to whether they want to defend or will let us defend. And that is absolutely the way the record clearly shows, that we have not abandoned them. We did not ignore their request. They just never called us and said, Hey, we want you to take over. Okay? We've been asking, and they won't let us. Did you ask to take over or did you ask we'll share? We asked to take over. Yes. And that's in the record. We've asked to take over. They won't let us. They won't send us any cases to defend. And that's because they want to control their defense. And they have. We'll continue trying, Judge, because these cases keep coming in, and we're going to keep trying to defend. And we'll do what we're supposed to do, which we've offered on limited defense. When we sent in 2008, we sent them a letter clearly saying that we'll defend any cases that you believe we should. Send us a list or send us the complaints, we'll take over. By the way, as to the complaints, we raised the fact that the complaints weren't in the record, both in 2006 and 2008. It's footnote one of our reply brief. The fact is that there are ways to do shortcuts to avoid having to read all the complaints. And we told both Judge Brandt and Judge Vestal that we believe that there are reasonable ways to do that with some summaries. So it's not that hard to put together a summary. The problem with their report that they submitted, it doesn't even list the cases. They cannot tell you which cases are in this judgment. I cannot tell you which cases are in the judgment. And I know I don't have all those complaints, that they weren't all produced to me. So I can't give the judge, yeah, I can't say look at what they say. They don't say anything about any particular case. They just give you a conclusion. Here's what we believe. And it wasn't even their expert who reviewed it. It was an associate of his, and he, in his deposition, could not tell me how they came about determining what policies were triggered. We don't even know if they used Raymark v. Zurich as a trigger in terms of what exactly they used to come up with the number. So, Your Honor, this is something in terms of the 1991 letters they referred to. Again, those letters came with a letter saying, here's our lawyer. We've already hired him. In fact, they were all like six months late. They had already hired lawyers, taken over the defense. In some cases, they could settle by that time. And in 2001, they gave us a list that they had already settled 700 cases. So when Judge Brandt found that the notice condition wasn't breached, he said that in 2001 you got a list. But the list showed closed cases. He said if some cases hadn't been settled before 2001, you'd have a point. And that's the issue. They didn't give us notice. They had settled cases before they gave us notice. That's not what our policies entitled them to do. And we remain willing and ready, and we have lawyers to defend them. And that's been the case throughout the years. We've been defending asbestos cases for a long time for a lot of people. And we're ready and willing to do it here. It's my understanding, though, isn't it, that the vast majority of these cases have been taken care of, settled, or tried, or whatever, already. And if there aren't now, they're kind of dribbling in. That's my understanding. These cases were through 2004. That's right. So there are more cases. Well, you said in 2008 that you would make this unconditional offer. But as far as the facts, factual pattern, is there a fact issue as to whether they want to control or not or whether they would let us control? The fact is when we offer in 2008, we've got to know. Okay? They won't let us take control. So we'll continue trying. But look at the facts. Is there a fact issue on that? Absolutely. Because you go back, it's consistent. They've always wanted to exercise control. And those 1960s policies don't give them that right. Yes, we're willing to work out a sharing if they want to control. Okay? We're giving up control to you, but we're not going to pay 100%. We're not obligated to under those 1960s policies. Those are defense policies, not reimbursement to defense policies. So it's their choice. They have the right to forego the defense, but they can't forego it and make us pay 100%. I have one last question I want to ask you. Relative to the notice and you said some of the cases were, you know, there was already an attorney assigned. Some were in settlement. Maybe some had settled. When you get those notices, what is the response that you set demanding now that they turn everything over to you? In terms of when they sent them back in, like, 2000 or what did we do? You're asking what we did then? Right. We had a number of meetings with them. We had meetings between our general counsel and theirs in Chicago in the mid-'90s. This is in the record. We talked about defense of asbestos. They wanted to control it. And that was true in 2001 when Blaine Stanley met with them. Her notes are in the record, and they say we want to defend themselves. They want to defend themselves. So this, as we say, there's factual issues here of significance on who, on what rights to control were given to us, if any, and whether we have shown you that there in 1988 and in 2008, you know, there are letters confirming a defense. We've given you testimony of Blaine Stanley, Mark Muth, and Mr. Mundy who were told not to defend or they didn't want a defense, okay? But from that, how are we? We don't have the right to force them to take our defense. Cincinnati says they must protect the right to forego, okay? That's what the Supreme Court said. So we can't force ourselves if they won't accept it. But we can offer, and we have and we will, unless anyone else has questions. I have one last question. Where is the offer to share coming in from the contract? It's a compromise when they want to control, Your Honor. It's not in the contract, but they want to control, which we don't have an obligation to give that control up, right? But they did have other policies where they had the right to hire counsel and pay all the defense costs themselves. That's where it comes in under the deductible policies. They told us they're assigning these cases to the deductibles, okay? They can do that. And they can apply all the dollars, which they did, to the deductibles. These same dollars now, the court's effectively taking them out of the deductible and putting it on us. But under those deductibles, they can defend, hire lawyers, do what they did. But where we're in the insurance contracts is the offer to share things. Well, Your Honor- Share costs. No, we- That's why we offered them that. We offered- The sharing. Both the sharing or alternatively we'll take over, correct. I mean, that's their choice. If they want to have control- And where is that obligation on the insurance company from the insurance contract? In terms of offering to share? It's the fact that they have a choice. They could say, we'll let you defend. Okay, we'll do that. And then we'll incur the money ourselves. Or they want to defend and pay it under the deductibles. But they were the ones who said they wanted to share. You know, back in 2001. They're the ones who brought up the sharing. It's in the notes, it's in the documents, in the testimony. They're the ones who wanted sharing. I mean, sharing came from them? Yes, in 2001. And Mr. Mundy had also brought up the idea. Okay, it's not uncommon when you have two policies, both with the right to control. One policy is Caterpillar's right to control under a deductible. The others are right under the 1960s primary. Both policies are triggered. They don't tell us about the suits. They hire their own lawyers. They enter settlements. And then they come and tell us, here's a notice. We don't deny it. We don't run away. We recognize that, look, this is a long-term issue here. There are going to be a lot of these cases. So what they told us initially was they wanted to just handle it themselves under deductibles and then under retentions. 2001, they said they want to share. Okay. We offered to defend. They didn't want it. They wanted to share. We paid them a share, and they say we breached. There are fact issues here for the finder of fact that could easily lead to a conclusion that they didn't want us to defend. And unless the panel has other questions, I thank you for your time. Thank you, counsel. Thank you. The court will take a brief adjournment for the next panel and take their seats. And we'll take this case under advisement.